### CLARK CAR CO. OF NEW JERSEY v. CLARK et al.

(District Court, W. D. Pennsylvania. July 2, 1925.)

1. **Assignments** ⬅➡19—Contract involving relation of personal confidence cannot be assigned by one party without consent of other.

When rights arising out of contract are coupled with obligations to be performed, and involve relation of personal confidence, contract cannot be assigned by one party without consent of the other.

2. **Patents** ⬅➡213—Contract leasing patent rights and inventions and business and assets of corporation to inventor was one of personal trust, precluding assignment without consent of corporation.

Contract between corporation and inventor, leasing to him patent rights and inventions which he had sold to corporation and all business and assets at stipulated rate, giving inventor charge of all records of corporation, was contract involving a purely personal trust, precluding assignment without consent of corporation.

**3. Patents ⊗⇒213.**

License to use patents is not assignable, except by agreement on part of licensor.

**4. Principal and agent ⊗⇒103(8)—Power of attorney to conduct business held not broad enough to give attorney in fact power to sell and convey business.**

Power of attorney authorizing attorney in fact to conduct business and generally to act for grantor *held* not broad enough to give attorney in fact power to sell and convey business.

**5. Principal and agent ⊗⇒97—General power in power of attorney is limited to performance of acts authorized in express powers.**

Where in a power of attorney certain specified powers are mentioned, and are followed by a general power, scope of general power is limited to performance of acts authorized in express powers.

**6. Principal and agent ⊗⇒152(4)—Buyer receives no title to property conveyed by attorney in fact without authorization.**

Where sale of business by attorney in fact was unauthorized under power of attorney, buyer received no legal title to property thus conveyed.

**7. Principal and agent ⊗⇒42—Conveyance by attorney in fact after principal became mentally incompetent was unauthorized, even though power was originally broad enough to authorize conveyance.**

Where principal, after executing power of attorney, became mentally incompetent, conveyance of property by attorney in fact after such time would be unauthorized, even though power of attorney was broad enough to authorize conveyance originally.

**8. Principal and agent ⊗⇒42.**

After-occurring insanity of principal acts as complete revocation of powers delegated to agent. .

**9. Insane persons ⊗⇒5—Conveyance by attorney in fact for insane person is void, regardless of other party's good faith.**

Contract by attorney in fact for insane person is void, regardless of other party's good faith and whether or not he had notice of insanity.

**10. Principal and agent ⊗⇒42—Court of equity may set aside conveyance by attorney in fact, made when principal was incompetent, particularly where consideration was inadequate.**

Where, at time of execution of deed by attorney in fact, principal was entirely incapable of executing a valid deed, court of equity would be justified in setting conveyance aside, particularly where there is gross inadequacy of consideration.

**11. Principal and agent ⊗⇒171(7)—Principal, who after regaining mental strength refused dividends from conveyance of his property by attorney in fact, held not to have ratified transfer.**

Where principal, before becoming mentally incompetent, had executed power of attorney under which attorney in fact had conveyed principal's business, and principal after subsequently recovering in mental strength had refused dividend checks offered him under terms of conveyance, *held*, that there was no ratification of transfer made by attorney in fact.

**12. Principal and agent ⊗⇒162—Creditor, securing transfer from attorney in fact after principal became sick, held not guilty of fraud.**

Creditor, securing conveyance from attorney in fact after principal had been taken sick, thinking he was within his legal rights in accepting transfer, *held* not guilty of fraud, so as to warrant setting aside transfer.

In Equity. Action by the Clark Car Company of New Jersey against the Clark Car Company of Pennsylvania and others, wherein defendant Charles H. Clark filed a counterclaim in the nature of a cross-bill as against the other defendants. Decree for plaintiff and for defendant Clark on his counterclaim.

Decree modified 11 F.[2d] 820.

William L. Day, of Cleveland, Ohio, and Arthur O. Fording, of Pittsburgh, Pa., for plaintiff.

Weller & Wicks, of Pittsburgh, Pa., for defendants Clark Co., of Pennsylvania, and Lanahan.

Watson & Freeman, of Pittsburgh, Pa., for defendant Clark.

SCHOONMAKER, District Judge. This is an action in equity. The plaintiff, Clark Car Company of New Jersey, as the owner of certain patent rights and inventions that had been leased by it to the defendant, Charles H. Clark, along with all its business and assets, is now seeking to set aside an assignment of said leasehold made by the defendant Charles H. Clark, through the agency of an attorney in fact, to the Clark Car Company of Pennsylvania, in which company, through the agency of the same attorney in fact, the defendant Frank J. Lanahan secured a controlling interest. The plaintiff also seeks an account from the defendants, respectively, of their operations under said lease.

The defendants Clark Car Company of Pennsylvania and Frank J. Lanahan have answered, denying plaintiff's right to the relief prayed for. The defendant Charles H. Clark has answered, admitting plaintiff's right to relief, except as to the answering defendant, and has filed a counterclaim in the nature of a cross-bill as against the defendants Clark Car Company of Pennsylvania and Frank J. Lanahan, demanding against them practically the same relief as the plaintiff is demanding.

The validity of this assignment through the agency of Clark's attorney in fact is assailed on the following grounds: (1) The so-called lease of the Clark Car Company of New Jersey to Clark individually was personal to Clark; and not assignable; (2) even if assignable, the grant of power contained in the letter of attorney was not sufficient to authorize this assignment; (3) Clark was non compos mentis, both at the time of the execution of the power of attorney and the execution and delivery of the assignment and transfer complained of; (4) there has been no ratification of the attempted transfer, either by the Clark Car Company of New Jersey or the defendant Clark; and (5) fraud on the part of Lanahan in securing this transfer.

The case was heard on the amended and supplemental bill of plaintiff, the answer and counterclaim of the defendant Clark, and the answers of the defendants Lanahan and the Clark Car Company, both to the amended and supplemental bill of the plaintiff and the counterclaim of the defendant Clark, and in addition thereto the proofs offered at the trial. From these we find the following facts:

The necessary jurisdictional facts appear —i. e., the plaintiff is a New Jersey corporation, the defendants are residents of Pennsylvania, and the amount in controversy is over $3,000. The defendant Charles H. Clark is an inventor, and in the year 1908 held patents covering appliances used in railway dump cars. He also had applications for other patents then pending and designs for new inventions for which no application has been filed. Under the terms of agreement dated May 25, 1908, between the defendant Clark and other persons, the plaintiff corporation was formed and became invested with the title to the Clark patents, and the right to · take over whatever others Clark might secure.

Some years thereafter, by written agreement of lease dated December 1, 1915, the plaintiff leased all its property and assets to the defendant Clark individually, which included the right to use these patents. By this agreement, Clark was to pay an annual dividend of 3 per cent. to the stockholders of the plaintiff company, and was in addition thereto to pay said stockholders 20 per cent. of his gross earnings in the manufacture of dump cars, over and above the sum of $20,000 per annum, to be divided among them pro rata to their stock holdings in the plaintiff company. During the years 1918, 1919, and 1920 Clark paid over $100,000 to the stockholders of plaintiff under the terms of this agreement.

In the year 1920, Clark's health began to fail. He suffered from an intestinal impaction, from which frequently he suffered such extreme pain that he was put under the influence of opiates. He was constantly under the care of a doctor, and during the year 1921 the illness had progressed to such an extent that he was away from business much of the time, and finally, on October 11, 1921, was removed to a sanitarium at Wellsville, N. Y., for treatment. This intestinal impaction produced autointoxication, or toxemia, which affected Clark's mind to a considerable extent before he left his home in Pittsburgh for the sanitarium. He rapidly grew worse at the sanitarium, and around the early or middle part of November lapsed into a state of coma, in which he was wholly unconscious and spoke to no one. It was thought that he could not live. Mental specialists were called to examine him, and on December 1, 1921, he was taken back to Pittsburgh, to the home of his brother. His comatose condition continued for about 10 days thereafter, when he came to and improved, though he did not entirely regain his health, and an operation was deemed advisable. On March 13, 1922, he was taken to St. Joseph's Hospital in Pittsburgh, where he shortly underwent two major operations, requiring the removal of portions of his intestines. He was discharged from the hospital on May 13, 1922, when his physical and mental condition began to improve, and by late June or early July he was able to go down town for business. During the early stages of his disease, and while he was at the Wellsville Sanitarium, he suffered such pain that he was kept a large share of the time under opiates.

When Clark left Pittsburgh for the Wellsville Sanitarium, his business affairs were not in good condition. He had been too ill to attend to business properly for some time prior thereto. He owed the Cambria Steel Company, which was engaged in building dump cars for him. He owed the Westinghouse Air Brake Company, the Ft. Pitt Malleable Iron Company, of which the defendant Lanahan was president, and other firms. His creditors were clamoring for money, and it seems there was no money on hand to pay them, as the dump car market appeared at that time to be dull. On the day he went away, Clark executed and delivered to Charles H. Hummel, an office man in his employ, a power of attorney to transact business, which is in the following language:

"Know all men by these presents that I,

Charles H. Clark, of ·Pittsburgh, Pennsylvania, have made, constituted, and appointed, and do hereby make, constitute, and appoint, Charles E. Hummel, of the same place, my true and lawful attorney, for me and in my name and on my behalf to receive and receipt for any and all sums of money or payments due or to become due to me, to deposit in my name in any bank or banks any and all moneys collected or received by him, to pay any and all bills, accounts, claims, and demands now or hereafter payable by me, to draw checks or drafts upon any and all bank accounts or deposits belonging to me, to act for me in any business in which I am now or have been engaged or interested, including the business conducted in the name of the Clark Car Company, and in connection with any contract or contracts heretofore made by me, including all contracts made in connection with the business of said Clark Car Company, and generally to do and perform all matters and things, transact all business, make, execute, and acknowledge all contracts, orders, deeds, writings, assurances, and instruments which may be requisite or proper to effectuate any matter or thing appertaining or belonging to me, and generally to act for me in all matters affecting my business or property, with the same force and effect to all intents and purposes as though I were personally present and acting for myself, hereby ratifying and confirming whatsoever my said attorney shall do by authority hereof.

"In witness whereof, I have hereunto set my hand and seal, this 11th day of October, 1921.

"[Signed]    Chas. H. Clark.    [Seal.]"

At or shortly after Clark went to the sanitarium at Wellsville, the defendant Lanahan heard of Clark's condition, and called at Clark's office to consult with Hummel and other office employes as to Clark's affairs and the amount of money needed to tide over his affairs and carry him through. Hummel thought that about $50,000 was needed to pay Clark's bills and carry on the business. Lanahan agreed to put up the $50,000, provided control of the business was turned over to him.

It appears that in 1918 Clark had taken out a Pennsylvania charter for a corporation by the name of Clark Car Company, with a view of consolidating his business with that of the New Jersey corporation, but this consolidation had failed and this charter lay dormant. Whereupon it was decided by Lanahan and Hummel to use this charter as the vehicle by which the control of Clark's business was to be turned over to Lanahan, and on November 17, 1921, Hummel, assuming to act under the power of attorney given him by Clark on October 11, 1921, transferred all of Clark's assets, business, and good will, including this lease agreement with the plaintiff, to the Clark Car Company of Pennsylvania, in consideration of $200,000 par value of the capital stock of the company. This stock was at first turned over by Hummel to Lanahan as collateral to his claim of some $58,000 against Clark, and later Hummel, assuming to act under this power of attorney, transferred $150,000, par value, of this stock to Lanahan in consideration of the sum of $50,000 paid by Lanahan to the Clark Car Company of Pennsylvania, the balance of said capital stock still remaining in Lanahan's hands as collateral. At the time these transfers were made, Clark was mentally incompetent to transact any business, as he lay in a state of coma at the Wellsville Sanitarium and was thought to be at the point of death. Prior to the date of these transfers, Lanahan had planned to go to the Wellsville Sanitarium to see Clark with reference to them, but did not go because he was informed that Clark was unable to see any one. Lanahan was apparently familiar with Clark's condition as early as November 7, 1921, for his letter to Clark of that date showed that he was familiar with his physical condition and possibly with his mental condition.

Lanahan sought a ratification of this assignment to the Pennsylvania corporation from the stockholders of the plaintiff at an informal meeting of some of them on or about December 5, 1921, but no ratification of this assignment was made by the stockholders. Later, by resolution on March 4, 1922, the directors of the plaintiff undertook to ratify the assignment from Clark to the Pennsylvania corporation of the lease agreement, and two of the directors say that this ratification was on condition of certain representations made by Lanahan at the informal meeting of some of the stockholders on December 5, 1921, to the effect that the stockholders of the plaintiff company would share in the advances to be made by Lanahan to care for Clark's business.

We do not find that there have been acts on Clark's part, after he had regained his health, which would amount to a ratification of this assignment on his part. It was shown that some dividends went into his bank account paid by the Pennsylvania Company under the agreement originally made between the plaintiff and Clark, but it appears that

11 F.(2d)—52

Clark personally had no knowledge of these till the dividends proffered in January, 1923, which were returned.

On the state of facts above found, we conclude that, as a matter of law, the plaintiff and the defendant Clark are entitled to the relief sought. We arrive at this conclusion because (1) the lease to Clark from the plaintiff was personal to him and was not assignable; (2) the letter of attorney to Hummel gave him no authority to transfer Clark's business and lease to the defendant corporation; (3) Clark, at the time his attorney undertook to act for him, was mentally incompetent to transact any business, and therefore his attorney in fact could not act for him; (4) there have been no such acts on the part of the plaintiff or the defendant Clark which amount to a ratification of the assignment to the Pennsylvania Company.

[1, 2] As to the agreement of lease of December 1, 1915, between the plaintiff and Charles H. Clark, it clearly falls within the well-established rule that, when rights arising out of contract are coupled with obligations to be performed, and involve a relation of personal confidence, the contract cannot be assigned by one party to the contract without the consent of the other. Delaware County v. Diebold Safe & Lock Co., 10 S. Ct. 399, 133 U. S. 473, 33 L. Ed. 674; Arkansas Valley Smelting Co. v. Belden Mining Co., 8 S. Ct. 1308, 127 U. S. 379, 32 L. Ed. 246; Burck v. Taylor, 14 S. Ct. 696, 152 U. S. 634, 38 L. Ed. 578; Colton v. Raymond, 114 F. 863, 52 C. C. A. 382; Demarest v. Dunton Lumber Co., 161 F. 264, 88 C. C. A. 310. By the contract between the plaintiff and Clark, he was "to have charge of all the records" of plaintiff. Surely that involved a purely personal trust. Clark was the man to have charge of the records, and not Clark's assignee. Then, again, Clark was to pay the stockholders of plaintiff "20 per cent. of the gross earnings of the lease." This meant Clark's earnings. Surely the earnings of a substitute for Clark were not in the minds of the parties. Then Clark was an inventor, and the plaintiff by the contract was to have a right to his future inventions.

[3] This contract provided that Clark should make certain payments direct to the stockholders of the plaintiff company, namely, a 3 per cent. annual dividend on their stock holdings in quarterly payments, and in addition Clark was to pay the stockholders of plaintiff, in proportion to their respective stockholdings, 20 per cent. of his annual gross earnings over $20,000. This contract was authorized by the stockholders of the plaintiff company, and they have never consented to the substitution of any one else in his place. True, the directors undertook to ratify this assignment at a meeting held in March, 1922; but, in view of the fact that certain rights were assured to the stockholders of the plaintiff company under the agreement of December 1, 1915, and that contract was authorized by the stockholders, it could not be assigned without the consent of the stockholders. This contract also licenses the defendant Clark to use the plaintiff's patents. Such a license is not assignable, except by agreement on the part of the licensor. Troy Factory v. Corning, 14 How. 193, 216, 14 L. Ed. 383; Hapgood v. Hewitt, 7 S. Ct. 193, 119 U. S. 226, 233, 30 L. Ed. 369. No agreement has been shown which authorizes the licensee to assign the patents covered by the agreement of December 1, 1915.

[4, 5] As to the power of attorney which Charles H. Clark executed on October 11, 1921, the date he departed for the sanitarium at Wellsville, that power certainly was not broad enough to give to the attorney in fact, Hummel, the power to sell and convey Clark's business. Hummel was authorized to do certain specific things with reference to carrying on the business. He was not authorized to sell. It is true that this power contains, at the end of it, a general power; but the rule of law is well settled that where, in a power of attorney, certain specified powers are mentioned, and these are followed by a general power, the scope of general power is limited to the performance of acts authorized in the expressed powers. Califf v. First National Bank, 37 Pa. Super. Ct. 412; Campbell v. Foster Home Ass'n, 30 A. 222, 163 Pa. 609, 26 L. R. A. 117, 43 Am. St. Rep. 818; Wilson v. Wilson-Rogers, 37 A. 117, 181 Pa. 80; Union Trust Co. v. Means, 50 A. 974, 201 Pa. 374; Johnson Railroad Co. v. Union Switch & Signal Co. (C. C.) 51 F. 85.

[6] It conclusively follows, therefore, that the act of the attorney in fact, Hummel, in conveying to the Pennsylvania corporation the Clark Car Company business and the business which Clark carried on under the name of C. H. Clark Company by the lease of December 1, 1915, was entirely unauthorized, and that the Clark Car Company of Pennsylvania received no legal title to the property thus conveyed. This goes to the very foundation of the defendants' claim of title in this action, and this of itself would be sufficient to justify the decree which the plaintiff is asking in this case, unless the defendant Clark has in some way ratified the unauthorized act of his attorney in fact.

[7, 8] Now, at the time that Hummel, attorney in fact, undertook to convey to the Pennsylvania Company all of Clark's business property and assets, Clark was entirely incompetent to do any business. On the very day that Hummel undertook to make conveyance, Clark lay in a state of coma in the hospital at Wellsville, New York, and had been in that condition for some time prior thereto. Therefore, even if we grant that the letter of attorney itself was broad enough in its terms to authorize the conveyance made by Hummel to the Clark Car Company of Pennsylvania, yet he was entirely without power at the time of the delivery of the assignment to the Pennsylvania Company.

The testimony in this case clearly establishes that Clark was mentally incompetent to do any business from November 1st until about the middle of December, and while there is evidence that he was not of sufficient mental capacity to issue a letter of attorney the day he was taken to the hospital on October 11, 1921, that is not sufficiently convincing to justify us in making a finding that Clark was mentally incompetent at the time he went to the hospital. However, we have no doubt as to his mental incapacity at the time the attorney in fact undertook to convey his principal's business to the Pennsylvania Company. Even though Clark might have been competent to execute the power of attorney on the 11th of October, his attorney had no power to act under it when the principal became mentally incompetent, as it has always been the rule of law that after-occurring insanity of the principal acts as a complete revocation of the powers delegated to the agent. Davis v. Lane, 10 N. H. 156; Chase v. Chase, 71 N. E. 485, 163 Ind. 178; M. & W. Refining Co. v. McMahon, 38 N. J. Law, 536.

[9, 10] Under the weight of federal authorities, a contract executed by the attorney in fact for an insane person is absolutely void regardless of the other party's good faith, or whether or not he had notice of the insanity. Dexter v. Hall, 15 Wall. 9, 21 L. Ed. 73; Edwards v. Davenport (C. C.) 20 F. 756. In this application of law by the federal courts, the question of notice on the part of Lanahan or Hummel as to Clark's condition at the time of the execution of this deed is not important, for the minute Clark became mentally incompetent, his power of attorney was at least suspended during the period of the incompetency, and any contracts executed during that period would be absolutely void. However, both Hummel and the defendant Lanahan had notice of Clark's serious condi-

tion. When the matter of this transfer came up between Hummel and Lanahan, it was arranged that Lanahan with some others would go to the sanitarium at Wellsville and call upon Clark with reference to it. They held themselves in readiness for two or three days to make the trip, but word came from the hospital from time to time that Clark was too ill to be seen and could not act. Therefore it cannot be said that Lanahan was without notice of the facts which should have led to the inquiry as to Clark's condition before he accepted a transfer from Hummel, attorney in fact. Even if it should be held that the defendant Clark was not actually insane, yet we think that under the authorities, where, as it appears in this case, at the time of the execution of the deed by the attorney in fact, Clark was entirely incapable of executing a valid deed, a court of equity would be justified in setting aside the conveyance. That is especially so where there is a gross inadequacy of consideration. Allore v. Jewell, 94 U. S. 506, 24 L. Ed. 260.

In the instant case, while Lanahan paid $50,000 for a three-fourths interest in the Pennsylvania corporation, he paid it, not to the defendant Charles H. Clark, but to the defendant corporation itself, so that Clark as an individual received no benefit from it, and the sole benefit went to the corporation of which Lanahan became the controlling factor.

[11] As to whether or not any act had been done by the defendant Clark which would ratify the unauthorized act of his attorney in fact, we are unable to find any evidence which will justify the conclusion that the defendant Clark has ratified the assignment executed in his behalf by Hummel. From the time that Clark went to the hospital at Wellsville in October, 1921, until June, 1922, he was not in a physical condition to take any active interest in the business at all. It is true that during a part of this period certain dividend checks payable under the contract of December 1, 1915, were issued by the Clark Car Company of Pennsylvania to the defendant Clark and deposited to his credit by some one in his behalf; but there is no evidence that Clark was sufficiently recovered in mental strength and health to act in the matter until he tried to secure control of his business again, when these dividend checks were refused and the matter placed in the hands of his attorney to replace him in his title. We cannot find, therefore, that Clark has done anything to ratify the transfer to the Pennsylvania corporation.

[12] Charges of fraud have been made in

this case against the defendant Lanahan in this transaction, but we do not find that the evidence is sufficient to justify this accusation. It may have been that Lanahan was interested in this matter with an intent to protect the indebtedness of the company of which he was president. We certainly believe from the evidence that the defendant Lanahan thought he was within his legal rights in accepting the transfer from Clark, through Hummel, to the Pennsylvania corporation, and the transfer of the controlling interest in the latter company to himself. So merely on the allegation of fraud, we do not think there is sufficient proof in this case to warrant setting aside transfers on account of fraudulent conduct on the part of the Lanahan. We base our findings rather upon the want of power shown in the letter of attorney, the nonassignability of the lease contract, the mental incapacity of Clark to execute a contract at the time his attorney acted for him, and the lack of proper evidence of ratification, either by the plaintiff or by the defendant Clark after his mental capacity had been restored. With this situation, the plaintiff is entitled to the relief prayed for, and is entitled to have a reconveyance of the lease contract from the Pennsylvania corporation to the defendant Charles H. Clark, who is in turn entitled to the reconveyance from the defendant Lanahan of the capital stock of the Pennsylvania corporation transferred to Lanahan by Hummel, the attorney in fact. The defendant Lanahan and the Pennsylvania Clark Car Company should account for their operations from the date that they took possession under the assignment to the Pennsylvania corporation. In this accounting, the defendant Lanahan would be entitled to credit for the $50,000 that he paid into the business at the time he became interested in it.

A decree may be submitted accordingly.